UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL L GREER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-01212-SEB-CSW |
| | ) | |
| DENNIS REAGLE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Michel Greer, a prisoner at Pendleton Correctional Facility (PCF), cannot see out of his right eye. His vision in his left eye is limited. He asserts that the defendants have violated his rights to adequate medical care under the Eighth Amendment and to reasonable accommodation of his disability under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA). The defendants seek summary judgment, arguing that Mr. Greer is not disabled and that they have not been deliberately indifferent to his medical needs.

**I. Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not

"scour the record" for evidence that might be relevant. *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. Facts

Mr. Greer's most recent eye exam took place July 8, 2022, and documents that he has no functional vision in one eye and limited vision in the other. Dr. Valerie Purvin described Mr. Greer as having "very poor vision" in his right eye and vision in his left eye that could be "correctable to 20/60" with glasses. Dkt. 49-1 at 1. Dr. Purvin's prescription clarifies that Mr. Greer's right eye had such "poor vision," *id.*, as to be nonfunctional. Dr. Purvin prescribed a corrective lens for Mr. Greer's left eye and a "balance" lens for his right eye—that is, a lens used when a person has correctable vision in one eye and non-functional vision that cannot be corrected in the other. *Id.*[1]

---

[1] *See also, e.g.*, Gary W. Asano, OD, *The case of the suddenly-monocular patient*, California Optometry 46 (May/June 2013) ("When one eye has very poor visual acuity, it is usually considered a "balance eye" and

Further, Dr. Purvin emphasized that Mr. Greer's glasses must feature polycarbonate (that is, plastic) lenses, *id.*, which are prescribed for people who can see out of only one eye because other materials are more likely to break and damage the person's functional eye.[2]

When the Court screened Mr. Greer's complaint, it identified plausible claims against four defendants under the ADA, the RA, and the Eighth Amendment. Dkt. 6 at 3. Three defendants are Indiana Department of Correction (IDOC) employees: Dennis Reagle was the warden of PCF; Aaron Smith was PCF's deputy warden; and Christopher Ertel was PCF's ADA coordinator. *See* dkt. 42 at 2. The fourth defendant, Lisa Hamblen, has served as PCF's health services administrator (HSA). *See* dkt. 46 at ¶ 11. Although she works at PCF in an administrative capacity, Ms. Hamblen has been employed by the IDOC's third-party medical care contractor—currently, Centurion Health of Indiana, LLC. *Id.*

Mr. Greer's claims are based on allegations that the defendants denied his repeated requests to recognize that he is disabled due to his visual impairment and allow him to buy a typewriter and

---

not considered functional."); Rialeigh Yoder, ABOC-AC, *Balanced - Lens Selection for the Monocular and Amblyopic*, avail. at https://www.2020mag.com/ce/balanced-lens-selection (last visited Feb. 14, 2024) ("A balanced eyeglass prescription is used for cosmetic purposes more than corrective purposes to make both eyes look similar behind the lenses even though one eye has no vision and therefore no correction. When the prescriber writes 'balance' on the prescription, it indicates that the eye with a balance lens has impaired vision or no vision.").

[2] *See, e.g.*, Mont. Admin. R. 37.86.2102(7)(f) (Medicaid Primary Care Services—Eyeglasses, Services, Requirements & Restrictions) ("The following lens features are not covered: polycarbonate lenses except for monocular members."); Indiana Family & Soc. Servs. Admin., *Indiana Health Coverage Programs— Provider Reference Module—Vision Services* (Jan. 4, 2024) (avail. at https://www.in.gov/medicaid/providers/files/modules/vision-services.pdf) ("The IHCP developed specific criteria for polycarbonate lenses to ensure that these lenses are used only for members with conditions that make additional ocular protection medically necessary," including when the patient "has low vision or legal blindness in one eye with normal or near normal vision in the other eye. . . . In all these situations, one or both eyes must be affected by an intractable ocular condition."; Ferris State University, *Polycarbonate*, https://www.ferris.edu/optometry/patient-care/lensmaterial/Polycarbonate.htm (last visited Feb. 14, 2024) ("Polycarbonate is a must for monocular (one-eyed) patients to protect the vision of their eye.").

large-print materials so he can work on his legal cases, including a state court postconviction relief matter. Dkt. 6 at 2–3. In his demand for relief, Mr. Greer stated:

> Plaintiff wants adequate equipment for a blind and visual impaired person adequate medical treatment. Such as a tablet thats he can use (talking tablet) follow Doctor orders and a money award of $5 million for the year of pain and suffering and deterioration of eyesight. proper recreation equipment, law library

Dkt. 2 at 6 (errors in original).

A.  **Medical Records and Correspondence**

In February 2020, while incarcerated at PCF, Mr. Greer underwent surgery to repair a detached retina in his right eye. Dkt. 49-2. No medical record provides any insight regarding the quality of Mr. Greer's vision for nearly two years following that surgery. As noted above, when Mr. Greer eventually received eye examinations, they showed significant impairment.

In November 2020, he wrote a request to the law library asking to use a typewriter on his legal work. Dkt. 41-2 at 6. A staff member responded that Mr. Greer could not use a typewriter in the law library because there were no typewriters in the law library. *Id.*

Mr. Greer sent a copy of his request and that response to Warden Reagle in December 2020. *Id.* Mr. Greer wrote:

> typwritter—LAW LIBRARY HAS NONE—That why I am asking to buy one. Need for central importance daily needs.
>
> (FADA Sec504—Visual impairments.)

*Id.* (errors in original). Deputy Warden Smith responded: "We are refreshing the Law Library computers. Windows has accessibility programs for the visually impaired. We also have clerks able to assist." *Id.*

The next month, Mr. Greer submitted a formal grievance stating:

> This is for a request(s) to Mr. Reagle for a typwritter (to buy one) Need for central importance daily needs plus Legal work under F.A.D.A.—Sec 504 for visual impairment.

4

> I have sent Mr Reagle numberest Request with (no) reply. I blind in right eye and the same that cause right eye blindness I have in left eye. And was told not to strain or stress left eye witch read and writing do. It is cause headache and burred visual to left eye. The request for Typwritter will help to stop the strain of writing between the lines of paper.
>
> [. . .]
>
> Like to buy owe typwritter for daily use for letter to outside and need for daily Legal work.

Dkt. 45-6 at 1 (errors in original).

The prison staff denied Mr. Greer's grievance and included two written responses. Dkt. 45-6 at 2. Casework Manager Cook wrote:

> ISR offers access to computers, and legal assistance in the law library. Ofd. Grear's current classification code 4-H-A-A-B-A does not represent him having a disability. The purchase of a typewriter to be used in his cell will not be approved. Once HCH is released from quarantine Ofd. Gear is welcome to access the law library for his legal needs.

*Id.* (errors in original). Meanwhile, HSA Hamblen wrote: "A typewriter is not needed for any medical issues." *Id.*[3]

In February 2021, Mr. Greer appealed the denial of his grievance. Dkt. 41-2 at 3. Mr. Greer stated that he was blind in his right eye and visually impaired in his left; that reading and writing strained his left eye and caused headaches and blurred vision; and that his disability classification was never revisited after his surgery in 2020. *Id.* A non-defendant staff member denied the appeal in April 2021 and offered the following written explanation:

> This matter has been discussed with Medical staff and our ADA compliance staff. Your code does not show that you have a disability and medical states that you have

---

[3] In her summary judgment brief, HSA Hamblen refers to this statement as hearsay. Dkt. 46 at 4–5. She does not deny, however, that she reviewed Mr. Greer's grievance or provided the response documented in the record, so the statement is admissible under Rule 801(d)(2) of the Federal Rules of Evidence. Fed. R. Evid. 801(d)(2)(A) (stating that an opposing party's statement is not hearsay).

>no medical need for a typewriter. The law library has access to computers with accessibility software. I will not approve the personal possession of a typewriter.

*Id.*

Mr. Greer quickly submitted a second-level appeal. *Id.* at 4–5. Mr. Greer reiterated that his disability classification had not been revisited since his 2020 operation, and he challenged HSA Hamblen's contention that his need for a typewriter was not based on a medical condition— namely, visual impairment. *Id.* That appeal was also denied. *Id.* at 1.

Mr. Greer wrote another request to the law library in November 2021. Dkt. 45-11 at 1. He asked whether the law library had typewriters he could use to work on a postconviction relief case due to his visual impairment. *Id.* He noted that he did not know how to use a computer. *Id.* A staff member responded, simply, "We do not." *Id.*

An ophthalmologist examined Mr. Greer in late January 2022—roughly two years after his retinal surgery. Dkt. 49-5. The doctor found a "[v]ery atrophic retina limiting vision" in Mr. Greer's right eye and a mild cataract in his left eye. *Id.* at 1. The ophthalmologist did not explicitly write that Mr. Greer was blind in one eye but did verify Mr. Greer's understanding that "polycarbonate lenses are important for monocular precautions," *id.*, presumably to protect Mr. Greer's only functional eye. According to treatment notes, Mr. Greer asked the doctor to find that his left eye was damaged by compensating for the vision loss in his right eye, but the doctor declined to make such a finding. *Id.* at 2. The ophthalmologist also observed that Mr. Greer did not have eyeglasses then and noted a plan to recheck his prescription and prescribe glasses after a follow-up visit. *Id.* at 1 ("Will recommend prescribing polycarbonate Rx if unchanged at next visit.").

Mr. Greer wrote to HSA Hamblen on February 21, 2022: "I was told to write you to get my classification change. I blind in one eye and my other eye impaired. I went out on 1-19-22. Need reclassification." Dkt. 45-12 (errors in original). HSA Hamblen responded: "Per paper work from

6

Eskenazi eye Dr. It does not say you are blind in your eye you have impairment but not enough to change code." *Id.*

As noted above, Mr. Greer visited a neurologist in July 2022, whose prescription of a balance lens indicates that Mr. Greer was functionally blind in one eye. Dkt. 49-1 at 1. The record does not document any change to his disability classification, medical care, or accommodations since then.

**B.     Deposition Testimony**

Mr. Greer received a pair of glasses sometimes after his retinal surgery in 2020, but they are not made of polycarbonate materials as the eye doctor prescribed. Consequently, Mr. Greer wears old polycarbonate glasses with an outdated prescription. Dkt. 41-1 at 16:14–19:16. He can see with those glasses, but his vision is blurred. *Id.*

Mr. Greer can handwrite without looking down at his paper. *Id.* at 26:5–14. He can use a typewriter because he knows where the keys are, but he cannot see a computer screen well enough to use a mouse. *Id.* at 27:3–15. He has not been able to take classes to learn Braille. *Id.* at 27:16–19. The law library computers have not been equipped with the accessibility software Deputy Warden Smith referenced, and the tablet Mr. Greer is allowed to use in his cell is too small for him to read. *Id.* at 26:15–27:2. Members of the law library staff sometimes help Mr. Greer use a computer or print research materials for him in large type, but they are "not supposed to do" this. *Id.* at 24:18–25:5. At most, Mr. Greer can go to the law library twice a week for one hour. *Id.* at 25:12–26:4.

Mr. Greer spoke face-to-face with Deputy Warden Smith and Mr. Ertel about his need for a typewriter. *Id.* at 22:24–23:12, 32:20–34:17. Deputy Warden Smith told Mr. Greer he could not

keep a typewriter in his cell unless he was classified as disabled, and Mr. Ertel told Mr. Greer that disability classification was a medical decision he had no authority to change. *Id.*

**C.      Disability Determinations**

The record does not clearly explain how the IDOC or its medical partners determine that an inmate has a disability or requires a reasonable accommodation within the meaning of the ADA and the RA. There is no explanation for how an inmate can seek such determinations when his health changes or who is responsible for making such determinations.

HSA Hamblen tendered three IDOC policies. Dkts. 45-7. 45-9, 45-10. One is dated April 1, 2022, which is after the acts and omissions discussed above were complete, and therefore the Court does not discuss it further. Dkt. 45-9. The other two polices—the Disability Status Classification Policy, dkt. 45-7 (dated January 1, 2018), and the Offenders/Youth with Physical Disabilities Policy, dkt. 45-10 (dated May 1, 2021)—are discussed below. Neither policy is accompanied by an affidavit or declaration from HSA Hamblen discussing the policy or its relationship to her decisions regarding Mr. Greer.

Under the Disability Status Classification policy, every inmate receives one of four codes. Dkt. 45-7. Inmates with Code A are "without significant physical, visual, hearing, or cognitive impairment." *Id.* at § II(B)(1). Inmates with Code B "are blind or have other significant visual impairments," such as "bilateral vision defects that even with best correction seriously adversely affects the offender's ability to participate independently in" activities of daily living. *Id.* at § II(B)(2). Even so, inmates "who have functional vision in one eye" are excepted from Code B. *Id.*

The Disability Status Classification policy requires that an inmate's disability classification and needs be assessed upon intake to the IDOC. *Id.* at § II(C). It also must be "reviewed minimally"

when "the presence of a disability is established or changed" and "[a]nnually as part of the annual screening process." *Id.* at § II(D). The Classification policy does not state who is authorized to make or change an initial disability classification determination.

Mr. Greer was assigned Code A in 2019. Dkt. 49-4. There is no evidence his classification has been revisited since then.

The Offenders/Youth with Physical Disabilities Policy, states that inmates with disabilities will be provided reasonable accommodations and that each prison must "designate a staff person who can assist offenders . . . with disabilities to obtain needed services and access to programs. Dkt. 45-10 at § IV(H). If an inmate "develops a physical disability while incarcerated," the inmate "shall be referred to the Health Services staff at the facility." *Id.* at § IV(K). The IDOC's "ADA Medical Coordinator shall work with the facility ADA Coordinator to sort out any needs." *Id.*

Warden Reagle did not personally participate in disability determinations or classifications. Dkt. 41-3 at ¶ 4. He attests that such determinations are made by "facility medical staff and/or the" HSA. *Id.* Warden Reagle also attests that he generally is not advised of disability determinations or inmates' requests for reclassification or accommodations. *Id.* at ¶ 5. He says such determinations and requests "are addressed solely per the discretion of the facility" ADA "Coordinator, the HSA, and medical staff." *Id.*

### III. Eighth Amendment Claims

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir.

2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources*, 839 F.3d 658, 662 (7th Cir. 2016)).

"A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)).

Deliberate indifference requires more than negligence or even objective recklessness. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). A plaintiff "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted).

The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). The Seventh Circuit has also held that deliberate indifference occurs when the defendant refuses "to take instructions from a specialist," *Petties*, 836 F.3d at 729, or chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

"Non-medical defendants . . . can rely on the expertise of medical personnel." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). "Non-medical defendants cannot simply ignore an

inmate's plight," but, "if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Id.* A non-medical defendant satisfies the Eighth Amendment by investigating an inmate's complaints and referring them to the responsible medical providers, unless the defendant knows or has reason to believe that the medical staff is mistreating the inmate or not treating him at all. *Id.* at 755–56.

**A.  Serious Medical Need**

The record would allow a reasonable jury to find that Mr. Greer had—and continues to have—a serious medical need. That serious medical need is a visual impairment that has worsened over time. In 2020, he had surgery for a detached retina. Two years later, an ophthalmological exam revealed that he had an "atrophic retina limiting vision" in his right eye and a mild cataract in his left eye. Dkt. 49-5 at 1. His condition was serious enough that he needed to take "monocular precautions." *Id.* at 1. A physician diagnosed these serious medical needs. *Perry*, 990 F.3d at 511.

Mr. Greer's serious medical needs, however, do not include a typewriter. No physician diagnosed Mr. Greer as requiring a typewriter, and common sense does not dictate that it was essential to solve a medical problem. *Perry*, 990 F.3d at 511. A typewriter is used to *write*. Mr. Greer's own testimony establishes that his visual impairment does not limit his ability to write. Dkt. 41-1 at 26:5–14. Rather, Mr. Greer's visual impairment limits his ability to *read*, which in turn causes him to experience headaches and eye strain. Dkt. 41-1 at 34:18–35:1. No evidence in the record supports an inference that access to a typewriter would have alleviated those symptoms.[4]

---

[4] *Cf. Jaros v. Illinois Dep't of Corrs.*, 684 F.3d 667, 671 (7th Cir. 2012) ("Jaros also alleges that he experienced severe pain in his hip while showering and using the toilet . . . but the presence of grab bars would not have made a difference because Jaros concedes that he experiences the same 'severe pain' whether walking, sitting, standing, or lying in bed.").

11

B.  **Deliberate Indifference**

The summary judgment record reflects that the correctional defendants—Warden Reagle, Deputy Warden Smith, and Mr. Ertel—did not know that Mr. Greer had unmet medical needs. Mr. Greer told them through his written correspondence that he needed a typewriter. Dkt. 41-2 at 6. When Mr. Greer spoke to these defendants in person, he told them he needed a typewriter or that he needed to change his disability code. Dkt. 41-1 at 22:24–23:12, 33:10–34:17. Mr. Greer did not tell them that needed different care or treatment for his serious visual impairment or that his visual impairment was harming him except in relation to his perceived need for a typewriter. No reasonable jury could find that the correctional defendants "actually knew of and disregarded a substantial risk of harm" related to his visual impairment. *Petties*, 836 F.3d at 728.

The summary judgment record also reflects that HSA Hamblen was not deliberately indifferent to Mr. Greer's serious medical needs. She had only two material interactions with Mr. Greer. She received and responded to Mr. Greer's January 2021 grievance, which requested permission to buy a typewriter. Mr. Greer stated in that grievance that reading and writing strained his eyes. Dkt. 45-6 at 1. He testified in his deposition, however, that writing does not strain his eyes. Dkt. 41-1 at 26:5–14. For the reasons noted above, HSA Hamblen had no reason to believe that a typewriter would make it easier for Mr. Greer to read. And, he requested no other medical care in his grievance.

Ms. Hamblen also reviewed and responded to Mr. Greer's February 2022 request to have his disability code reassessed because he was blind in one eye and visually impaired in the other. Dkt. 45-12. Ms. Hamblen's response was by no means exemplary. She responded that the ophthalmologist found that Mr. Greer was *impaired* in both eyes, not blind in one, even though a careful reading would have revealed that the ophthalmologist found that Mr. Greer needed to take

12

"monocular precautions" because he had no functional vision in his right eye. *Id.* Still, Ms. Hamblen could not have known in February 2022 that Mr. Greer had unmet medical needs related to his eyesight. Reading the record in the light most favorable to Mr. Greer, the ophthalmologist indicated that Mr. Greer needed glasses and did not currently have any, and the Seventh Circuit has observed that deprivation of corrective lenses can amount to a serious medical need under the Eighth Amendment. *See Alexander v. Richter*, 746 F. App'x 611, 613–14 (7th Cir. 2018). But the ophthalmologist also noted a plan to recheck Mr. Greer's prescription at a follow-up appointment, and he submitted his grievance only a month later. Dkt. 49-5 at 1. At that point, Ms. Hamblen was free to trust that Mr. Greer was in the capable care of a specialist. *Arnett*, 658 F.3d at 755–56.

In short, the summary judgment record shows that Mr. Greer has serious medical needs that have gone unmet and remain unmet. However, no reasonable jury could find that the defendants knew that Mr. Greer's serious medical needs were unmet when he last sought their help in February 2022, so all defendants are entitled to summary judgment on the Eighth Amendment claim.

### IV. ADA and RA Claims

Mr. Greer alleges that the defendants discriminated against him based on his disability and failed to accommodate him. Mr. Greer's claim arises under "Title II of the ADA, which prohibits disability-based discrimination in the provision of public services, programs, and activities." *Moore v. W. Illinois Corr. Ctr.*, 89 F.4th 582, 594 (7th Cir. 2023) (citing *Lacy v. Cook County, Illinois*, 897 F.3d 847, 852 (7th Cir. 2018); 42 U.S.C. § 12132).

"To establish a violation of Title II of the ADA, the plaintiff must prove that he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities

13

of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal quotations omitted). The elements of a RA claim are "functionally identical" except the plaintiff must also prove that the defendant accepts federal funding, *see id.*, and neither defendant contests this element.

**A.  Disability**

First, Mr. Greer must establish that he is a qualified individual with a disability by demonstrating that he has "a (1) physical impairment (2) that substantially limited (3) one or more major life activities." *Moore*, 89 F.4th at 594 (citing 42 U.S.C. § 12102(1)). The phrase "substantially limits" is not meant to be a demanding standard. 29 C.F.R. § 1630.2(j)(1)(i). In fact, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Moore*, 89 F.4th at 594 (citing 29 C.F.R. § 1630.2(j)(1)(ii)).

By statute and regulation, "seeing" and "reading" are major life activities. 42 U.S.C. § 12102(2)(a); 29 C.F.R. § 1630.2(i)(1)(i). Although not "a *per se* rule, . . . people with monocular vision 'ordinarily' will meet the [ADA's] definition of disability." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566–67 (1999).

A reasonable jury could find that Mr. Greer has a physical impairment because there is evidence that since at least January 2022, he has had monocular vision and that his good eye is only functional with corrective lenses. Further, Mr. Greer testified that his limited vision prevents him from seeing a computer screen and limits his ability to read materials that have not been enlarged. Further, Mr. Greer has offered "evidence that the extent of the limitation in terms of" his

"own experience . . . is substantial." *Albertson's*, 527 U.S. at 567. For purposes of summary judgment, Mr. Greer has demonstrated that he is a qualified individual with a disability.

B.     **Denial of Access and Reasonable Accommodation**

Mr. Greer must next establish that he was denied the benefits of programs, services, or activities by reason of his disability. "Refusing to make reasonable accommodations is tantamount to denying access." *Jaros*, 684 F.3d at 672. "Whether a requested accommodation is reasonable is highly fact-specific, and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001). "Whether the requested accommodation is necessary requires a 'showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability.'" *Id.* (quoting *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995)).

Resolving factual disputes in Mr. Greer's favor, a jury could reasonably find that he has been denied reasonable accommodations and therefore denied access to programs, services, and activities—namely, use of the law library and research materials available to other inmates.

The correctional defendants argue that Mr. Greer was not denied access because the "law library was reasonably equipped to enable Plaintiff and other visually impaired offenders to utilize facility legal resources." Dkt. 42 at 11. Specifically, they contend, the "library computers contained software designed to assist the visually impaired and had the capability to print materials in large print," and "staff regularly assisted him by enlarging the print of computer materials and helped conduct legal research on his behalf." *Id.* at 11–12. But this argument views the record in the light most favorable to the *defendants*. Mr. Greer attests that the law library computers are not equipped with accessibility software and that staff members who find and enlarge research materials for him do so in violation of prison rules. Meanwhile, other inmates can research using electronic tablets

15

in their cells, but Mr. Greer cannot read the screen on his tablet, so he can only research when he is physically in the law library—at most, two hours per week. *See* dkt. 41-1 at 24:18–27:2.

The accommodations Mr. Greer seeks are not limited to typewriter access. In his complaint, Mr. Greer demanded "adequate equipment for a blind and visual[ly] impaired person," including a tablet with accessibility software. Dkt. 2 at 6. Mr. Greer reiterated these requests in his deposition. Dkt. 41-1 at 41:16–42:2.[5] He wrote HSA Hamblen about and spoke to Mr. Ertel about revisiting his disability classification more broadly—not just about obtaining a typewriter. Dkt. 41-1 at 32:20–34:17; dkt. 45-12. At the most basic level, the record would also allow a reasonable jury to find that Mr. Greer went long stretches without proper eyeglasses and that he still may not have them. Dkt. 41-1 at 16:14–19:16.

In short, the record would allow a reasonable jury to find that Mr. Greer has sought accommodations that would better enable him to utilize the law library's services and engage in the daily activities of reading and seeing. Indeed, the fact that the defendants have cited some of these accommodations as reasons Mr. Greer should be able to access the law library's services would seem to eliminate any dispute that they are reasonable. Viewing the facts in the light most favorable to Mr. Greer, a reasonable jury would have to find that he has been denied reasonable accommodations and therefore deprived of access to programs, services, and activities by reason of his disability.

---

[5] When asked if he was seeking injunctive relief, Mr. Greer answered, "Not right now," but quickly added "I'm just trying to get my medical code changed so I can get my legal work done," and "I can't use the tablet because it's too small. You know, I requested at least try to get me a talking tablet so I can respond to my people." *Id.* The Court does not find, as the correctional defendants suggest, that Mr. Greer "abandoned" his request for injunctive relief through this testimony. *See* dkt. 52 at 1, n.1.

## C. Individual Responsibility and Deliberate Indifference

Because a reasonable jury could determine that Mr. Greer was a qualified individual with a disability and that he was denied access to programs, services, or activities by reason of his disability, the Court must determine what claims will move forward against which defendants.

### 1. Claims for Damages

Compensatory damages are available in ADA and RA claims only if the plaintiff shows "intentional discrimination." *See Strominger v. Brock*, 592 F. App'x 508, 511 (7th Cir. 2014). A plaintiff "can establish intentional discrimination . . . by showing deliberate indifference." *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 863 (7th Cir. 2018). Deliberate indifference requires (1) "knowledge that a harm to a federally protected right is substantially likely" and (2) "failure to act upon that likelihood." *Id.* (internal quotations omitted). "In other words, a plaintiff must prove indifference that is a deliberate choice by defendants." *Lange v. City of Oconto*, 28 F.4th 825, 841 (7th Cir. 2022). As with Mr. Greer's Eighth Amendment claims, no reasonable jury could find deliberate indifference by any defendant.

Even when Mr. Greer asked the correctional defendants about reviewing his disability classification, his testimony indicates that their communications centered on typewriter access. Mr. Greer's repeated requests for a typewriter would not have put the defendants on notice that he was substantially likely to be denied access to programs, services, and activities, because a typewriter would not have better enabled Mr. Greer to engage in the daily activities of seeing and reading.

Mr. Greer's claims against HSA Hamblen are more complex but still do not amount to deliberate indifference. Ms. Hamblen read the records from Mr. Greer's January 2022 ophthalmology exam, which revealed that he had monocular vision. At minimum, Ms. Hamblen

17

had reason to believe Mr. Greer was disabled. *See Albertson's*, 527 U.S. at 566–67. Assuming, though, that she read the whole report, understood that Mr. Greer was blind in one eye, and recognized that he was likely disabled, no evidence would allow a reasonable jury to find that she knew he was likely being denied access to activities, programs, or services. The ophthalmologist did not identify any activities, programs, or services unavailable to Mr. Greer. The ophthalmologist indicated that Mr. Greer needed glasses and did not currently have them, but the ophthalmologist also wanted to examine Mr. Greer one more time before setting his prescription—indicating Mr. Greer did not need glasses immediately. Without more, there is no basis for finding that HSA Hamblen knew Mr. Greer's rights were likely being violated.

   **2. Claims for Injunctive Relief**

Although the record does not support claims for damages, Mr. Greer may continue with injunctive relief claims under the ADA and the RA. As discussed above, the record would allow a reasonable jury to find that Mr. Greer is disabled and that, because of his disability, he is able to access programs, services, and activities available to other inmates. The Court must therefore determine proper defendants for Mr. Greer's remaining claim for injunctive relief.

The IDOC's policies indicate that, at minimum, each prison's ADA coordinator and its medical staff have responsibilities for determining the presence or extent of an inmate's disabilities and what accommodations are warranted. *See* dkt. 45-10. Therefore, Mr. Ertel and HSA Hamblen are proper defendants for injunctive relief claims because they "would be responsible for ensuring that any injunctive relief is carried out." *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

## V. Conclusion

The defendants' motions for summary judgment, dkts. [40] and [44], are **granted** as to Eighth Amendment claims and as to claims for damages under the ADA and RA. Their motions are **denied** as to injunctive relief claims under the ADA and RA.

Claims against Warden Reagle and Deputy Warden Smith are **dismissed with prejudice**. The **clerk is directed** to **terminate** them as defendants on the docket. No partial final judgment will issue.

Injunctive relief claims under the ADA and RA will proceed against Mr. Ertel and Ms. Hamblen in their official capacities. These claims will be resolved by settlement or a bench trial for equitable relief. The Court intends to recruit counsel to represent Mr. Greer through the remainder of the action. The **clerk is directed** to include a form motion for assistance recruiting counsel with Mr. Greer's copy of this order. He will complete and return the form or notify the Court that he wishes to continue without a lawyer **no later than March 15, 2024**. If Mr. Greer takes no action in the time provided, the Court will attempt to recruit counsel for him in accordance with the conditions noted on page 4 of the form motion.

**IT IS SO ORDERED.**

Date: 3/6/2024

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

MICHAEL L GREER
962733
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Jordan Douglas Hall
Lewis and Wilkins LLP
hall@lewisandwilkins.com

Travis W. Montgomery
Bleeke Dillon Crandall, P.C.
travis@bleekedilloncrandall.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com